IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 6, 2025

**STATE OF TENNESSEE v. PHILIP CAVITT**

**Appeal from the Criminal Court for Shelby County**
**No. 20-01825      Lee V. Coffee, Judge**

───────────────────────────────

**No. W2024-00673-CCA-R3-CD**

───────────────────────────────

Defendant, Philip Cavitt, appeals as of right from his jury conviction for aggravated sexual battery, for which he was sentenced as a Range II offender to twenty years. On appeal, Defendant contends that the evidence was insufficient to support his conviction. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and STEVEN W. SWORD, JJ., joined.

W. Price Rudolph (on appeal) and John L. Dolan (at trial), Memphis, Tennessee, for the appellant, Philip Cavitt.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Gavin A. Smith and Tanisha Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises from Defendant's sexually abusing J.H.,[1] his stepson, during a one-month period while J.H.'s mother was in jail. The May 2020 term of the Shelby County Grand Jury returned an indictment charging Defendant with rape of a child, a Class A felony. *See* Tenn. Code Ann. § 39-13-522.

─────────────

[1] It is the policy of this court to protect the privacy of minors and victims of sexual offenses by referring to them using their initials.

At trial, Memphis Police Department Lieutenant Angela Tucker testified that her colleague, who was the case officer in Defendant's case, was unavailable for trial. Lieutenant Tucker stated that J.H. and his grandmother Sonya[2] were interviewed and that it was not uncommon for minor victims to disclose abuse that occurred one or more years prior to the disclosure.

On cross-examination, Lieutenant Tucker agreed that she was not personally involved in Defendant's case. She stated that when she was the case officer, she would normally arrange for a victim to undergo a forensic medical examination. Lieutenant Tucker noted that, at the time J.H. disclosed the abuse, their policy was to set up a medical examination within ninety-six hours of the disclosure. Lieutenant Tucker acknowledged that no medical examination was performed in this case. Lieutenant Tucker stated that it was not unusual for a victim not to be sent for a medical examination if the disclosure was delayed for more than 120 hours. Lieutenant Tucker stated that it depended on the circumstances.

J.H. testified that he was eleven years old and in the sixth grade at the time of the trial and that his grandmother had custody of him. He stated that, when he was in kindergarten, he and his four siblings lived with his mother and Defendant. J.H. noted that he called Defendant "Dad" and that he lived with Defendant beginning when he was three or four years old and ending when he was seven or eight years old. J.H. identified Defendant in the courtroom.

J.H. testified that he did not like Defendant because he "was very mean[,]" and that, beginning in kindergarten, Defendant beat him. J.H. explained, "So if I was acting bad in school, he just whipped me, which I understand that, but sometimes I didn't have to do nothing. He'd just use his fist and he'd punch me." J.H. stated that Defendant punched him on his chest and body and that Defendant would also "pick [him] up and he'd throw [him] to the floor." J.H. denied that they were playing. J.H. said that, when Defendant threw him onto the "hard floor," it hurt and that he felt "kind of dizzy" and "couldn't think straight." J.H. stated that Defendant also used a belt to "spank" his backside and back. J.H. said that the belt left marks that looked like "slashes all over [his] butt" and that the blows "hurt a lot" and "burned." J.H. stated that, when Defendant struck him with a belt, he wanted his mother to help him but that, even if his mother was watching the beatings, she would not help him.

J.H. testified that his mother did not feed them; he explained that she taught him how to make noodles but that, when the children asked her to make food, she "wouldn't

---

[2] Because J.H. and his grandmother share a surname, to further protect J.H.'s privacy, we will refer to her by her first name. We intend no disrespect in doing so.

answer" and would stay in her bedroom all day. J.H. stated that he ate a lot of Jell-O, which was available in the refrigerator.

J.H. testified that the first incident of sexual abuse occurred in the summer of 2018, when he was six years old. J.H. said that he was asleep in his bedroom when Defendant called J.H. to his room early in the morning. J.H. stated that his mother was not present because she was in jail. Defendant was wrapped in a blanket and holding out a hamburger in a wrapper. J.H. noted that he ate a lot of fast food and that he liked it more than Jell-O. J.H. testified that Defendant told him to take off his clothing. J.H. stated that he was confused and that he thought Defendant was going to give him the food. J.H. said that after he undressed, Defendant told him to lie face down on the bed, which he did. J.H. stated that Defendant was also nude, although he could not see Defendant's penis. J.H. stated that Defendant "got on top of [him] and was . . . laying down straight . . . beside [him]" with Defendant's head next to J.H.'s. J.H. testified that Defendant "put his penis inside of [his] a**hole" "a bunch of times." J.H. said that he wanted Defendant to stop and that it "hurt a lot" and "felt really bad." J.H. stated that he was "screaming and crying" but that none of his siblings came into the room. He said that it was not unusual for his siblings to hear him screaming and crying when Defendant beat him. J.H. stated that, during the penetration, Defendant told him, "You're going to hell, boy."

J.H. testified that the incident "didn't last a really long time" and that Defendant let him get up and told him to use the bathroom. J.H. put on his clothing and left the bedroom. He said that he "never thought of" telling his siblings what had happened. J.H. explained that he was the eldest of five siblings and that his youngest siblings were twins who were one or two years old at the time their mother was in jail. J.H. stated that Defendant anally penetrated him on five or six occasions.

J.H. testified that, the last time the penetration happened, he was in his bedroom alone with Defendant and was acting as though he had made his bed, although he had not. Defendant told him to take off his clothing. J.H. could not remember whether Defendant told him to lay on his stomach, but he did so. Defendant began penetrating him anally; J.H. "tried to fight him back" by pushing him off, and Defendant "punched [him] off the bed" by swinging one fist and hitting his head or upper chest. J.H. did not believe Defendant "was finished yet." J.H. stated that he was crying and that Defendant left. J.H. said that he was "pretty sure" his mother was released from jail shortly afterward; she had been in jail for about one month. J.H. testified that, after his mother returned, Defendant did not beat J.H. as often.

J.H. testified that, after his mother got out of jail, Defendant told him to tell his mother what Defendant did. J.H. stated that his mother was in the bathroom sitting down, and Defendant stood behind J.H. while J.H. told her that Defendant had stuck his penis in

J.H.'s rectum. J.H. said, "I think she was smoking something. She had a fisheye, and she didn't say nothing to me." J.H. explained that a "fisheye" meant that one of her eyes was not looking at him. He thought that she was smoking marijuana because "she used to have it rolled up" in little bags. J.H. stated that marijuana smelled "funny" and different from cigarettes.

J.H. testified that, one year after his initial disclosure, he told his grandmother about the abuse. He stated that she was washing his back and told him never to let anyone touch him "down there." J.H. told her that Defendant "had did that to [him] one time," that his grandmother began crying, and that he "explained the situation to her." His grandmother told his aunt, and J.H. later had an interview. J.H. identified a copy of his recorded forensic interview; he stated that he had written his initials on the disc after watching the interview a few days before trial. He averred that he told the truth in the interview and that he had testified truthfully.

J.H. thought that school had finished for the summer when the incidents occurred. He denied that he ever saw Defendant go to work. J.H. did not know how food got to the house; he stated that Defendant "probably" took them to get fast food, although he did not remember. J.H. agreed that Defendant cooked food for them, but he did not remember Defendant's ever going to a grocery store. He stated that, one time, a woman visited the house but that he did not see any other adults during the one-month period when his mother was in jail.

J.H. acknowledged that he did not tell anyone about the abuse while it was happening, call anyone, or ask anyone to take him to a doctor. He stated that the abuse occurred during the day and that it never happened at night. J.H. said that, after each of the incidents, he would "go back to what [he] was doing before." He recalled that, before one incident, he was watching television with his siblings. J.H. did not think that he ever had bleeding as a result of the penetration. J.H. testified it was "much easier" for him to remember the penetration and Defendant's telling him that he would go to hell than whether Defendant went to work.

Sonya testified that she was J.H.'s maternal grandmother and that she had known Defendant through J.H.'s mother for about seven years. She stated that J.H. lived with Defendant while his mother was in jail from May to June 2018. Sonya said that Defendant promised to bring J.H. to visit Sonya while J.H.'s mother was in jail but that he did not do so. Sonya testified that, after J.H.'s mother was released from jail, Sonya became concerned about J.H. Sonya stated that she went to their home and got J.H. after his mother agreed. Sonya denied knowing that Defendant had sexually abused J.H. at the time. She explained that she was not concerned about the younger children because she knew Defendant did not like J.H. Sonya acknowledged that she had a "kind of special place" in

her heart for J.H.  Sonya gained custody of J.H. in 2019 and J.H. had been living with her since then.

After Sonya gained custody, she said she was helping J.H. clean up after a bowel movement and that J.H. told her, "[Y]ou remember you told me not to ever let nobody . . . touch me back there . . . .  Well, [Defendant] did."  She said J.H. told her that Defendant "had raped him continuously."  Sonya said that she took J.H. to the Memphis Child Advocacy Center (CAC) and that they interviewed him.  She said the employees told her that they thought J.H. had been sexually abused.  Sonya testified that she did not have a medical examination performed on J.H. and that no one asked her to do so.  She noted that she believed "they wouldn't be able to tell anything" because of the amount of time that had passed.  Sonya reiterated that she did not take J.H. to the doctor after he disclosed the abuse because she thought it had been too long since the contact occurred.  She denied ever seeing blood in J.H.'s underwear, although she stated that he had blood in his stool.  Sonya did not take him to the doctor for the bloody stools.  Sonya acknowledged that she was not present when the abuse occurred and that she could not say when it happened other than sometime while J.H.'s mother was in jail.

Sonya testified that, while J.H.'s mother was in jail, she was concerned about all of the children's welfare.  She did not know if Defendant's parents watched the children during the month that J.H.'s mother was in jail, although she thought they did "from time to time."  She stated that she called Defendant and spoke to him during that time, asking about the children generally, and that he told her the children were "fine."

Sonya testified that she lived about two miles from J.H. but that she never went to check on the children while J.H.'s mother was in jail.  Sonya stated that she knew she was unwelcome at the house "as far as [Defendant was] concerned.  He didn't want [her] there."  Sonya stated that J.H.'s mother went to work while Defendant was at home caring for the children.  Sonya declined to say that Defendant "never" worked, but she said she did not "know of him going to work."

Sonya agreed that J.H.'s mother was technically her granddaughter; she adopted J.H.'s mother at nine months old after Sonya's daughter passed away.  Sonya denied ever having been convicted of a felony.  Sonya testified that she was especially concerned about J.H. because he was her first grandchild.  When asked whether she was aware of Defendant's beating J.H., Sonya responded affirmatively.  She stated that, when J.H. was around six years old, she observed injuries to J.H.'s body and that she went to the police and reported the physical abuse.  Sonya identified a photograph that a police officer took of J.H.'s backside, which showed multiple dark lines on his lower back and backside.  On recross-examination, Sonya clarified that she took J.H. to the police department after she took custody of him and saw the marks on J.H.'s rear.  J.H. told her that his mother told

Defendant to whip him. Sonya stated that she only came to Defendant's house when J.H.'s mother was there alone with the children. Sonya acknowledged that she never saw Defendant hit J.H.

Stephanie Holloway testified that she was an investigator with the Tennessee Department of Children's Services (DCS) and that she had handled more than 1,000 cases in twelve years at DCS. Ms. Holloway spoke to Sonya and observed J.H.'s forensic interview at the CAC through a television monitor. Ms. Holloway testified that a forensic medical examination was scheduled for J.H. but that it was not conducted because they "were unable to locate his legal caregiver to give consent." Ms. Holloway stated that J.H.'s mother was his legal caregiver at that time.

On cross-examination, Ms. Holloway testified that, in spite of the resources available to her, she had been unsuccessful in finding "quite a few people over the years." She stated that she searched for J.H.'s mother several times and that she spoke with Sonya about her location. Ms. Holloway acknowledged that someone could have filed a petition for dependency and neglect in Shelby County Juvenile Court, requesting that the juvenile court appoint a guardian for J.H. She further acknowledged that the appointed guardian could have consented to a forensic medical examination. Ms. Holloway agreed that she did not take these steps in J.H.'s case.

Teresa Onry, a forensic interviewer at the CAC, testified as an expert in forensic child interviews. She conducted J.H.'s forensic interview on December 5, 2019. She stated that, aside from knowing whether the child had disclosed physical or sexual abuse, they "tri[ed] to go in as blind as possible because the whole point of [them] being there is to be unbiased." Ms. Onry identified a disc containing a J.H.'s interview, which had been redacted by the parties' agreement. Ms. Onry also identified a photograph of J.H. she took at the end of their interview. Ms. Onry testified that J.H. disclosed sexual abuse during the interview. She did not know if a medical examination was performed.

The redacted recording of J.H.'s interview was played for the jury. In the recording, J.H. stated that he was in second grade and that Sonya brought him to the CAC to be "checked out." According to J.H., Sonya told him that Defendant was a pedophile "for what he did to [J.H.]" When asked what Defendant did, J.H. stated that Defendant "put his penis in [J.H.'s] butt" in Defendant's bedroom. J.H. said that Defendant told him to take off his clothes and that he complied, noting that he was "scared of" Defendant. J.H. stated that Defendant laid him face down on the bed with his face in a pillow. When asked how he could tell it was Defendant's penis going in his rectum, J.H. stated that he felt it; he initially stated that he did not see Defendant's penis but later said that Defendant showed it to him before laying him on the bed. J.H. stated that the penetration hurt and that his

rectum was itchy after. J.H. said that afterward, he had to use the restroom, and Defendant told J.H. that he was going to go to hell and left.

J.H. stated that it happened more than one time and that the second time was the same as the first. J.H. noted that sometimes Defendant would "skip days and that would make [J.H.] even [more afraid]." J.H. said that it occurred in Defendant's bedroom and also on J.H.'s bed. He denied that Defendant had him touch Defendant's body, that Defendant put his penis anywhere else on J.H.'s body, or that anyone else had put their penis on J.H.'s body.

J.H. stated that the incidents occurred while his mother was in jail when he was five or six years old and that the sexual abuse ended when she was released from jail. J.H. stated that Defendant told him to tell J.H.'s mother about the abuse, which he did. J.H. did not think she believed him because she did not say anything. J.H. stated that he also told Sonya about the abuse after it ended but that she told him not to "speak about that" because she thought he was making it up. He said that he told Sonya again when he was older and that she and his mother now believed him.

Dr. Amanda Taylor testified as an expert in sexual assault nurse examinations; she was the director of nursing at the Crime Victim and Rape Crisis Center. She stated that one third to one half of the 2,000 forensic examinations she had conducted were on children, including children who were between five and seven years old who had reported anal penetration by an adult's penis. Dr. Taylor said that she did not always see an injury or blood after such penetration, depending on the size of the penis and how far it went into the anal canal. Dr. Taylor added that people healed at different rates and that some scars healed over time.

Dr. Taylor testified that, with children, they did not insert anything into the anus during an examination. She agreed that conditions like constipation also caused anal injuries in children and that, even if an injury was visible, she had no way to tell what caused it. Dr. Taylor stated that J.H. had an appointment with her office but that they did not ultimately examine him. Dr. Taylor stated that most of her pediatric patients did not have injuries, and she denied that a lack of injury meant that they had lied about being abused.

The State elected the first instance of anal penetration described by J.H. for the single count of the indictment. The jury convicted Defendant of the lesser-included offense of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court imposed a maximum in-range sentence of twenty years with statutorily mandated 100% service. Defendant filed a timely motion for new trial, which was denied, and timely appealed.

## Analysis

Defendant contends that the evidence is insufficient to support his conviction, arguing that "no reasonable juror could credit the testimony of [J.H.]" and that "no reasonable jury would have found [Defendant] guilty of aggravated sexual battery absent physical evidence" or injury. The State responds that the evidence is sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and][t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2).

In the light most favorable to the State, the evidence at trial showed that J.H. and his younger siblings were in Defendant's care while their mother was in jail between May and June 2018, when J.H. was six years old. J.H. recounted that, early one morning, Defendant called him into Defendant's bedroom and told him to undress; Defendant was wrapped in a blanket and was holding fast food that J.H. believed was for him. Defendant laid J.H. face down on the bed with his face in a pillow, and J.H. described that Defendant

repeatedly inserted his penis into J.H.'s rectum while J.H. screamed and cried. Defendant told J.H. that he would go to hell. J.H. stated that the penetration occurred five or six times in the month that his mother was in jail. J.H. reported the abuse to his mother, who did nothing, and he eventually reported it to Sonya after he was living with her. The evidence is more than sufficient for a rational jury to find that Defendant intentionally touched J.H.'s anus, a primary genital area, for purposes of sexual gratification.

Defendant argues that J.H. was not a credible witness and that, essentially, the jury did not afford enough weight to the lack of physical injury, both of which he argued at trial. Issues of witness credibility and the weight to be afforded to the evidence are the exclusive province of the trier of fact, and we will not disturb those determinations on appeal. *Bland*, 958 S.W.2d at 659. We note that the jury convicted Defendant of a lesser-included offense and that the evidence would have been sufficient to convict him of rape of a child as charged. Defendant is not entitled to relief on this basis.

## Conclusion

Based on the foregoing and the record as a whole, the judgment of the criminal court is affirmed.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE